STATE OF CONNECTICUT *v.* SHERI PAIGE
(AC 27986)

DiPentima, Beach and Robinson, Js.

718

Argued February 5—officially released July 21, 2009

*Alexander H. Schwartz,* for the appellant (defendant).

*Marjorie Allen Dauster,* senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane,* state's attorney, *John H. Malone,* senior assistant state's attorney, and *Maura K. Coyne,* assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, Sheri Paige, appeals from the judgment of conviction, rendered after a jury

trial,[1] of perjury in violation of General Statutes § 53a-156 (a) (count two), tampering with or fabricating physical evidence in violation of General Statutes § 53a-155 (a) (2) (count four), forgery in the second degree in violation of General Statutes § 53a-139 (a) (1) (count five), larceny in the second degree in violation of General Statutes §§ 53a-119 (2) and 53a-123 (a) (5) (count six), larceny in the first degree in violation of General Statutes §§ 53a-119 (2), 53a-121 (b) and 53a-122 (a) (2) (count seven), two counts of larceny in the first degree in violation of §§ 53a-119 (1), 53a-121 (b) and 53a-122 (a) (2) (counts eight and nine), and two counts of larceny in the first degree in violation of §§ 53a-119 (1) and 53a-122 (a) (2) (counts ten and twelve).[2] On appeal, the defendant claims that (1) the evidence was insufficient to support the jury's verdict on "many of the charges" against her and (2) the trial court improperly directed the jury to find that the state had proven an element of the crime of perjury, as charged in count two. After a thorough review of the record, we affirm in part and reverse in part the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In the 1990s, Kriemhilde Byxbee lived in Stamford with her husband. They had no children. During that time, Heidi Hemingway and Beverly Cogswell cleaned Byxbee's home. In 1997, Hemingway and Cogswell each made approximately $20 every time they cleaned

[1] The jury returned a verdict of not guilty as to one count of larceny in the first degree in violation of General Statutes §§ 53a-119 (2) and 53a-122 (a) (2) (count eleven). The defendant was also charged with two additional counts of perjury in violation of General Statutes § 53a-156 (a) (counts one and three). The court granted the defendant's motion for a judgment of acquittal as to counts one and three following the close of evidence. Ultimately, she was convicted of nine charges.

[2] On August 10, 2006, the court imposed a total effective sentence of twelve years of incarceration with five years special parole. The court also imposed a fine of $100,000.

Byxbee's home. Before his death in November, 1997, Byxbee's husband asked Hemingway and Cogswell to take care of his wife after he died. Byxbee was eighty-two years old at the time of her husband's death. Following the death of Byxbee's husband, Hemingway's and Cogswell's duties changed to include grocery shopping, preparing Byxbee's meals and doing the laundry. Byxbee, who had suffered a stroke, had difficultly walking and did not drive. As Byxbee's health declined, she became unable to cook or clean for herself, had difficulty maintaining personal hygiene and appeared to have increased difficulty in understanding what was going on around her. Cogswell began helping Byxbee pay her bills, which Cogswell had noticed were going unpaid. In general, Byxbee was financially conservative. She was sparing with her money, with the exception of the holiday season, when she would give Cogswell and Hemingway $200 each. She became increasingly protective of her money as she got older.

Following a brief hospitalization of Byxbee in 1999, a social worker advised Byxbee to "get her affairs in order." Byxbee expressed a desire to stay in her home until her death. Although Byxbee initially rejected the idea, Hemingway eventually was able to persuade Byxbee to execute a living will. Hemingway contacted the defendant, an attorney, who previously had represented members of Hemingway's family. In April, 1999, the defendant met with Byxbee at her home for approximately forty-five minutes and subsequently prepared a living will, which Byxbee signed. This was the only time that the defendant met Byxbee.

After meeting with Byxbee, the defendant spoke with Hemingway and inquired of Byxbee's assets. When Hemingway stated that Byxbee owned a number of properties and did not have any children, the defendant advised Hemingway that Byxbee should execute a will so that Hemingway could "get something out of . . .

Byxbee for . . . services rendered." The defendant told Hemingway and Cogswell that in the absence of a will, all of Byxbee's property would go to the state when she died. Hemingway and Cogswell eventually persuaded Byxbee to execute a new will. The defendant then arranged for attorney Kevin O'Grady to come to Byxbee's home and to draft a new will, which Byxbee executed.

Hemingway and Cogswell learned that they were the beneficiaries of the new will and were each entitled to half of Byxbee's estate. The defendant advised Hemingway and Cogswell that Byxbee should begin liquidating her assets to avoid high estate taxes. The defendant explained that gifting the money in $10,000 increments annually would lower the applicable taxes. She instructed Cogswell and Hemingway to have Byxbee write checks to people they could trust for $10,000 each and then have these individuals cash the checks and give the money to Hemingway or Cogswell. Specifically, the defendant told Hemingway, who then told Cogswell, to cover the top portion of the check and to have Byxbee sign it. The defendant also told Hemingway to give Byxbee an alcoholic drink before asking her to sign the blank checks. The defendant instructed Hemingway and Cogswell to tell Byxbee that they needed to finish paying her bills or that they needed money to buy groceries. Hemingway and Cogswell would then fill in the top portion of a check with the name of a family member or a specific person at the direction of the defendant.

At the defendant's instruction, Byxbee's money market account was closed without Byxbee's knowledge, and approximately $200,000 was deposited into Byxbee's checking account. The proceeds were then distributed to Hemingway, Cogswell and the defendant by check. Hemingway and Cogswell hid Byxbee's monthly bank statements from her. Hemingway

received approximately $300,000 as a result of the gift-giving plan. Cogswell and Hemingway employed the same method to have Byxbee sign legal documents prepared by the defendant. Specifically, Cogswell would cover up a portion of the document, tell Byxbee that the document related to her late husband's estate or encourage Byxbee to have a drink before asking her to sign the document.

The defendant also arranged for Byxbee to purchase a life insurance policy from Mutual of Omaha. Warren Seper, the defendant's husband, procured the policy for Byxbee. Because Byxbee refused to purchase the policy during her meeting with Seper, the defendant instructed Hemingway to impersonate Byxbee when a representative from the insurance company called Byxbee to ask questions about her health. The defendant instructed Hemingway to tell Byxbee that her physician wanted her to have a physical examination to ensure her compliance with the examination required by the insurance company. The defendant established the Kriemhilde Byxbee life insurance trust (Byxbee trust), with herself as trustee, to receive the proceeds of the $400,000 life insurance policy.

In the last year of her life, Byxbee owned three different houses in the Stamford area. The defendant facilitated the sale of the properties as part of the plan to liquidate Byxbee's assets to avoid estate taxes. Byxbee purportedly signed an authorization, witnessed by Hemingway and Cogswell, instructing the defendant to prepare a power of attorney for Hemingway to act on Byxbee's behalf. Hemingway attended the closings, signed various documents related to the sale of the properties and collected the proceeds of the sales.

After the sale of the first house, Hemingway gave the defendant approximately $60,000 to $70,000 of the proceeds and deposited the remainder into Byxbee's

bank account. Through checks to their family members, Cogswell and Hemingway each received approximately $80,000 from the sale of the first house. The proceeds from the sale of the second house went into the trust account rather than the bank account because that account had been emptied from the numerous checks written as gifts in the preceding months. On September 19, 2000, without Byxbee's knowledge, Hemingway sold the house on Dann Drive in which Byxbee lived before she was moved into a nursing home. Cogswell and Hemingway held a tag sale to sell Byxbee's furniture and belongings. Byxbee was also unaware that the proceeds from the sale were distributed to the defendant's family members as well as to Hemingway and Cogswell.

David Rabin, a physician, saw Byxbee on April 3, 2000, to perform an evaluation of her memory. He diagnosed Byxbee with chronic progressive dementia with significant cognitive impairment. He testified at trial that "[g]iven the degree of her dementia, it was likely that there was some degree of impairment going on back a minimum of three to five years." He also determined that Byxbee had suffered a small stroke within the previous thirty days.

On July 29, 2000, Byxbee was admitted to Stamford Hospital where she was diagnosed with an infection. She also underwent surgery for the removal of a benign mass the size of a tennis ball in her right breast. Rabin testified that a woman without dementia would have noticed the mass. Byxbee suffered another stroke during her stay at the hospital. Rabin testified that Byxbee was disoriented and would not have been able to comprehend the extent of her assets or to evaluate her future financial needs. Barry Spevak, a geriatric specialist, evaluated Byxbee over several days of her hospitalization and concluded that Byxbee suffered from chronic progressive dementia, could no longer care for

herself at home and should be moved to a nursing facility for long-term care.

On August 11, 2000, Byxbee moved into Mediplex, an assisted living facility in Westport. Martin Perlin, who treated Byxbee at Mediplex, testified that Byxbee was disoriented, often fixated on her cats and that her "informed decision making process was severely impaired because of her underlying illness." Byxbee died on September 27, 2000.[3]

In October, 2000, the defendant informed Cogswell that on the basis of her ten years of experience with insurance companies, she anticipated that Mutual of Omaha would resist paying out the $400,000 policy on Byxbee's life. Specifically, the defendant advised Cogswell that Cogswell and Hemingway were more likely to receive the full amount of the policy if they hired an attorney to deal with the insurance company. Cogswell and Hemingway then agreed that the defendant would represent them and attempt to secure the full payment from the insurance company. Byxbee purportedly had signed an "Authorization to Act As Counsel" on August 26, 1999. The document authorized the defendant to represent the Byxbee trust "[i]f, for any reason whatsoever, regardless of fault or blame, the insurance company does not send the proceeds to the [Byxbee trust] within [thirty] days after [Byxbee's] death" and specified that the defendant would receive a 25 percent contingency fee for recovery of the proceeds of the insurance policy. Anna Lucia Hall worked at the defendant's law firm. Although Hall did not meet Byxbee or witness her signature, Hall's signature appears as that of a witness to Byxbee's on the authorization.

On October 10, 2000, Hemingway and Cogswell signed a contract with the defendant, agreeing to the

---

[3] Hemingway and Cogswell testified that they originally were designated as executrices of the estate but that after Byxbee's death, they declined the appointment. The defendant then became executrix of the estate.

terms of the defendant's 1999 contract with Byxbee and agreeing that the defendant would receive 25 percent of the proceeds recovered from the insurance policy. Specifically, the authorization stated: "I authorize [the defendant] to represent the Trust and obtain the policy proceeds, I have read [the defendant's] 1999 contract with Mrs. Byxbee, I agree to its terms and we agree that [the defendant] will receive 25 [percent] of the proceeds which she recovers . . . as a contingency fee."

In April, 2001, Mutual of Omaha made a $408,372.60 payment on the life insurance policy. The defendant deposited the amount into the Byxbee trust account. Mutual of Omaha also, in response to a request from the defendant's office, refunded a percentage of the premium paid on the policy, which totaled $47,556.67.

In April and May, 2001, the defendant wrote three checks from the Byxbee trust as the trustee. The checks were payable to M&T Bank, which held the mortgage on the defendant's home. The first check, dated April 25, 2001, was $20,000 and represented the legal fees charged by the defendant. The second check, dated April 26, 2001, was for $102,093.15 and represented a 25 percent contingency fee for recovery of the insurance policy proceeds. The third check, dated May 7, 2001, was for $11,889.17 and represented a 25 percent contingency fee for recovery of the insurance policy premium. All of the checks were applied to satisfy the mortgage on the defendant's home. In April, 2001, Hemingway and Cogswell signed a document authorizing the defendant to make disbursements from the Byxbee trust. The authorization included payment to the defendant of $102,093.15 and $11,889.17 as contingency fees for recovery of the policy proceeds and premium, respectively, and payment of $20,000 for "[e]state [l]egal [f]ees and [t]rust fee retainer." On May 24, 2001, Hemingway and Cogswell also signed a trust accounting, which

authorized three disbursements to the defendant relating to her representation of the Byxbee trust.

Subsequently, Hemingway learned from the defendant that the Byxbee trust account had been nearly depleted. In August, 2001, Hemingway and Cogswell hired an attorney, Neal Rogan, to investigate what had happened to the funds in the Byxbee trust account. Rogan discovered that only $39,042.46 remained in the Byxbee trust. Shortly thereafter, Hemingway and Cogswell commenced litigation against the defendant to recover the funds she had taken from the Byxbee trust account.

While the civil action was pending, the defendant was arrested in 2004 and charged in a twelve count amended information. After the jury found the defendant guilty of perjury, tampering with or fabricating physical evidence, forgery in the second degree, larceny in the second degree and five counts of larceny in the first degree, the court sentenced her to twelve years incarceration, with five years special parole. This appeal followed.

I

The defendant first claims that the evidence at trial was insufficient to support her conviction on "many of the charges" against her. We address her claim as to those counts for which she has provided an analysis of the evidence, namely, counts four, five, six, seven, eight, ten and twelve.[4] We disagree with the defendant as to

[4] Because the defendant does not provide us with analysis of the evidence with regard to counts two and nine, we deem any insufficiency claim as to those counts abandoned due to inadequate briefing. See *State* v. *Blango*, 103 Conn. App. 100, 116 n.11, 927 A.2d 964 ("[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failing to brief the issue properly." [Internal quotation marks omitted.]), cert. denied, 284 Conn. 919, 933 A.2d 721 (2007).

counts four, five, eight, ten and twelve; we agree with the defendant as to counts six and seven.

We begin by setting forth the familiar standard of review for a sufficiency of the evidence claim. "[W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007).

Additionally, as our Supreme Court has often stated, "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and

logical." (Internal quotation marks omitted). *State* v. *Na'im B.*, 288 Conn. 290, 296, 952 A.2d 755 (2008). "Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because [our Supreme Court] has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000).

Finally, we note that "proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Na'im B.*, supra, 288 Conn. 297. Cognizant of our standard of review, we address the evidence in support of each count in turn.

A

The defendant claims that there was insufficient evidence to sustain her conviction on count four, tampering with or fabricating physical evidence, and count five, forgery in the second degree. Both of these counts focus on a March, 2001 letter purportedly from Mutual of Omaha and introduced by the defendant in a legal

proceeding. In count four, the state alleged that the defendant committed the crime of tampering with or fabricating physical evidence in violation of § 53a-155 (a) (2). Specifically, the state alleged that between September 27, 2000, and December 10, 2002, the defendant presented a letter dated March 15, 2001, purportedly from Kathy Douglas of Mutual of Omaha, knowing the document to be false and with the purpose of misleading a public servant, Judge Frank D'Andrea, who was engaged in a hearing on an application for a prejudgment remedy. In count five, the state alleged that the defendant committed the crime of forgery in the second degree in violation of § 53a-139 (a) (1) when, between September 27, 2000, and December 10, 2002, the defendant, with intent to defraud or to deceive, falsely made a letter dated March 15, 2001, purportedly from Douglas, of Mutual of Omaha, which expressed an intention to rescind the life insurance policy on Byxbee.

On appeal, the defendant argues that to prove that she intended to mislead a public servant in producing the letter under § 53a-155 (a) (2) and that she intended to defraud or to deceive in forging the letter under § 53a-139, the state was required to offer evidence explaining to the jury the nature of the proceedings and legal issues before the court at the hearing. The defendant reasons that without this evidence "the jury had no evidence to connect what it reasonably could have found [the defendant's] conduct to have been with the intent motivating that conduct."[5] We disagree.

Section 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he . . . (2) makes, presents or uses any record, document or thing knowing

---

[5] The defendant does not challenge the sufficiency of the evidence as to the additional elements of tampering or fabricating physical evidence and forgery. Therefore, we limit our review to the element of intent as to each count.

it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding." A person is guilty of forgery in the second degree "when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status . . . ." General Statutes § 53a-139 (a) (1).

The following additional facts are relevant to the defendant's claim. After learning that the Byxbee trust nearly had been depleted, Hemingway and Cogswell hired Rogan to initiate a civil action against the defendant to recover the funds that the defendant improperly procured from Byxbee and her estate. In the resulting proceedings, the defendant testified regarding her efforts on behalf of Hemingway and Cogswell to collect the $400,000 insurance policy taken out on Byxbee's life. On July 15, 2002, the defendant testified that she had not received any written communication from Mutual of Omaha but that she had received verbal communication that Mutual of Omaha was not going to pay the life insurance policy. On September 24, 2002, the defendant testified that she had not received anything on Mutual of Omaha letterhead rescinding the policy. Then, on December 4, 2002, at a hearing in Stamford, the defendant submitted a fabricated letter from Mutual of Omaha. The letter, dated March 15, 2001, and purportedly signed by Douglas, read: "Due to the fact that Mrs. Byxbee did not fully disclose various material medical conditions on her insurance application, we will rescind the policy and return the premiums paid. If you have any questions about the policy or the claims process,

please do not hesitate to contact us." The defendant testified that the document was the original. On December 10, 2002, during a civil proceeding before Judge D'Andrea, the defendant testified falsely that her office had received the March 15, 2001 letter. At a subsequent hearing on March 4, 2003, the defendant testified that after her office had received the March 15, 2001 letter, her office received a telephone message from someone at the insurance company saying that the letter was sent prematurely but that the company's position had not changed.

On July 1, 2003, the defendant offered two additional versions of the March 15, 2001 letter, each of which included portions of Companion Life Insurance Company's[6] address and telephone number as well as portions of a series of numbers. The defendant explained that the difference between the second and third versions of the letter were attributable to the photocopying process. The second and third versions of the letter were substantially different from the first version offered at the December 4, 2002 hearing, which does not contain any information at the bottom of the letter.

Douglas did not write the letter, and it does not conform to the format or procedures used by Mutual of Omaha in contacting clients or rescinding policies. Specifically, the letter does not contain a document number or the company name and does not contain a reference to the underwriting or legal department, as required by Mutual of Omaha policy. Investigators were unable to locate a copy of the letter in Mutual of Omaha's files or computers. None of the correspondence between Mutual of Omaha and the defendant's office, including correspondence after March 15, 2001, refers to the letter or the alleged telephone call from Mutual of Omaha regarding rescission of the policy.

---

[6] Companion Life is an affiliate company of Mutual of Omaha.

The defendant directs our attention to *State* v. *Widlak*, 85 Conn. App. 84, 856 A.2d 446 (2004), in support of her proposition that the state was required to explain to the jury the nature of the proceeding and legal issues before Judge D'Andrea so that the jury would have sufficient evidence to return a verdict of guilty on counts four and five. We disagree that *Widlak* supports the defendant's position. In *Widlak*, the defendant had been charged previously with a violation of probation. Id., 86. At the initial hearing on the violation of probation, the state indicated that it would seek an increase in bond unless the defendant could provide a new address. Id. Following that proceeding, the defendant convinced an acquaintance to provide him with a lease to a building that the acquaintance did not yet own. Id. At a later hearing on the violation of probation, the defendant submitted that lease as proof of his new address. Id., 87. When subsequent investigation proved the lease to be fraudulent, the defendant was charged with fabricating physical evidence and forgery. Id., 87–88.

On appeal, this court in *Widlak* concluded that the state had presented sufficient evidence to support the defendant's conviction on both charges. Id., 91–93. Although the court noted that the jury heard evidence regarding the initial probation proceeding and the fact that the state indicated that it would move for an increase in bond if the defendant did not provide the court with a new address, this court did not suggest that the jury must understand the nature of the proceeding in which the defendant submitted the fabricated document to find that the state had proven each element of the alleged crimes beyond a reasonable doubt. Id., 90–93. Rather, this court, noting that "[o]rdinarily, knowledge and intent can be proven only by circumstantial evidence"; (internal quotation marks omitted.) id., 90; concluded that the evidence was sufficient to prove

that the defendant possessed the lease knowing it to be false and presented it with the purpose of misleading the state. Id., 90–91.

In the present case, the jury heard evidence that Hemingway and Cogswell had initiated proceedings against the defendant to recover moneys that the defendant had obtained from Byxbee and Byxbee's estate and that the defendant had testified before Judge D'Andrea during an official proceeding. The jury also heard evidence that the defendant testified initially that she did not receive any written communication from Mutual of Omaha indicating an intent to rescind the policy but later presented the March 15, 2001 letter. The defendant then submitted multiple versions of the March 15, 2001 letter and testified as to why information was missing from the bottom of the version of the letter she submitted originally. The jury also heard testimony from Douglas that she had not written the letter. In sum, the jury had before it more than sufficient evidence that the defendant had fabricated the March 15, 2001 letter and that she had testified falsely regarding the letter during an official proceeding before Judge D'Andrea, a public servant, on December 10, 2002.

"While jurors may not speculate to reach a verdict, they may draw reasonable, logical inferences from the facts proven to reach a verdict." (Internal quotation marks omitted.) State v. Clay, 51 Conn. App. 694, 698, 724 A.2d 1134, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999). "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) State v. Smith, 110 Conn. App. 70, 79, 954 A.2d 202, cert. denied, 289 Conn. 954, 961 A.2d 422 (2008). As this court has often noted, "[b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial

evidence and the rational inferences drawn therefrom. . . . [I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Outlaw*, 108 Conn. App. 772, 778, 949 A.2d 544, cert. denied, 289 Conn. 915, 957 A.2d 880 (2008). Thus, as to count four, the jury was presented with sufficient evidence to conclude that the defendant had fabricated the letter and that she had submitted it with the purpose of misleading Judge D'Andrea into believing that the letter was authentic. See General Statutes § 53a-155 (a) (2). Similarly, as to count five, the evidence reasonably permitted a finding that the defendant forged the March 15, 2001 letter "with intent to defraud [or] deceive . . . ." General Statutes § 53a-139 (a). Accordingly, we conclude that there was sufficient evidence to sustain the verdict against the defendant for tampering or fabricating physical evidence and for forgery in the second degree.

## B

The defendant also argues that the evidence presented at trial was insufficient to support the jury's verdict of guilty as to counts six and seven. In count six, the state alleged that the defendant committed the crime of larceny by false pretenses as defined by § 53a-119 (2), in violation of § 53a-123 (a) (5).[7] The state

---

[7] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (5) the property, regardless of its nature or value, is obtained by embezzlement, false pretenses or false promise and the victim of such larceny is sixty years of age or older . . . ."

Because we conclude that the evidence was insufficient to establish that the defendant committed larceny by false pretenses, we need not address the other provisions of § 53a-123 (a) (5).

alleged that the defendant had wrongfully obtained Byxbee's property, specifically two lamps and a jewelry box, by false pretenses, namely, that the defendant induced Byxbee to give her the items as gifts. In count seven, the state alleged that the defendant wrongfully obtained checks written from Byxbee's checking account by false pretenses, as defined by § 53a-119 (2), in violation of §§ 53a-122 (a) (2) and 53a-121 (b). Specifically, the state alleged that the defendant obtained the checks by false pretenses, namely, that the checks were gifts made pursuant to a plan to minimize Byxbee's estate taxes.[8] On appeal, the defendant argues that the state failed to present evidence that she communicated a false pretense to Byxbee that induced her to deliver possession of her property to the defendant. We agree with the defendant.

The state presented the following evidence in support of its allegations in counts six and seven. At some point, Cogswell was added as a signer on Byxbee's checking account because Byxbee's handwriting was nearly illegible. Cogswell would use the debit card connected to the checking account to purchase groceries for herself and for Byxbee. In August, 2001, the defendant picked out a jewelry box and two Waterford crystal lamps as purported gifts to her from Byxbee. She instructed Hemingway to have Byxbee sign a check to pay for the jewelry box and instructed Cogswell to pay for the

---

[8] General Statutes § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property . . . exceeds ten thousand dollars . . . ."

General Statutes § 53a-121 (b) provides in relevant part: "Amounts included in thefts committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of the offense."

Because we conclude that the evidence was insufficient to establish that the defendant committed larceny by false pretenses, we do not address the other elements of §§ 53a-122 (a) (2) or 53a-121 (b).

lamps with the debit card for Byxbee's checking account. Hemingway later picked up the jewelry box and lamps and delivered them to the defendant's office.

As explained previously, the defendant instructed Hemingway and Cogswell to have Byxbee sign blank checks as part of the gift giving plan. In this manner, the defendant or members of her family received checks from Byxbee in the amount of approximately $120,500. Although Hemingway initially wrote the checks out to the defendant's relatives in the amount of $10,000, two of the checks had been altered such that the amount was $20,000. Hemingway testified that Byxbee did not authorize the gifts.

Section 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . . (2) . . . A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person." We find *State* v. *Farrah*, 161 Conn. 43, 282 A.2d 879 (1971), instructive. In *Farrah*, our Supreme Court applied General Statutes § 53-360, the predecessor to § 53a-119 (2), which read, "[a]ny person who, by false token, pretense or device, obtains from another any valuable thing . . . with intent to defraud him or any other person . . . shall be fined . . . or imprisoned." (Internal quotation marks omitted.) *State* v. *Farrah*, supra, 46–47. The court thereafter enumerated the elements necessary for a conviction of the crime of larceny by false pretenses: "(1) That a false representation or statement of a past or existing fact was made by the accused; (2) that in making the representation he knew of its falsity; (3) that the accused intended to defraud or deceive; (4) that the party to whom the representation was made was in fact induced thereby to act to her

injury; and (5) that the false representation or statement was the effective cause of the accused receiving something of value without compensation." Id., 47; see *State* v. *Rochette*, 25 Conn. App. 298, 306, 594 A.2d 1006 ("[t]o be found guilty of this crime, a person, therefore, must knowingly make a false representation with the intent to defraud, and that false representation must induce action that effectively causes the accused to receive something of value without compensation"), cert. denied, 220 Conn. 912, 597 A.2d 337 (1991), cert. denied, 502 U.S. 1045, 112 S. Ct. 905, 116 L. Ed. 2d 806 (1992); 32 Am. Jur. 2d, False Pretenses § 44 (2007) ("[t]o establish the crime of obtaining money or property by false pretenses, it must be shown that the defrauded party relied upon the misrepresentation made by the defendant"); W. LaFave, Substantive Criminal Law (2003) § 19.7, p. 114 (larceny by false pretenses occurs when defendant makes false representation of fact that causes victim to pass title of property to defendant); 3 F. Wharton, Criminal Law (15th Ed. 1995) § 414, p. 530 (false representation must cause victim to turn over her property).

Although it is conceivable that a defendant may commit larceny by false pretenses through the use of an accomplice or coconspirator; see id., § 415; in the present case, the jury was not presented with evidence that the defendant made a false representation that caused Byxbee to purchase the jewelry box or the lamps for the defendant. Rather, as to count six, the jury heard evidence that the jewelry box was paid for by a check that Byxbee had signed and Hemingway later filled in. The jury also heard evidence that the lamps were paid for using a debit card connected to Byxbee's account, to which Cogswell had been added as a signer when Byxbee's handwriting became difficult to read. The jury did not hear evidence, however, that Byxbee had knowledge of these gifts or that she agreed to purchase the

gifts on the basis of any representation made by the defendant.

Similarly, the jury was not presented with evidence that the defendant made a false representation that induced Byxbee to sign the checks comprising the larceny alleged in count seven. Instead, the jury heard evidence that Byxbee had no knowledge that she was signing checks to the defendant or the defendant's family members. Indeed, the jury was presented with substantial evidence that Byxbee was unaware of the gifting plan supposedly aimed at reducing estate taxes and that Byxbee lacked the capacity to agree to such a plan. Put another way, the jury heard no evidence that the defendant made a false statement that was communicated to Byxbee either by the defendant or a third party that induced Byxbee to relinquish her property.[9]

Accordingly, we conclude that the evidence was insufficient to support the jury's verdict as to counts six and seven.

C

The defendant further claims that the evidence was insufficient to support her conviction on count eight. Specifically, she argues that the evidence was insufficient to support a conviction of embezzlement, as defined by § 53a-119 (1). We disagree.

---

[9] Our conclusion is required because of the state's burden of proving each element of the specific crime charged. In charging the defendant with larceny in the second degree in violation of § 53a-123 (a) (5) by false pretenses as defined by § 53a-119 (2), the state assumed the burden of proving each element of the alleged offense. See *State* v. *Hersey*, 78 Conn. App. 141, 167, 826 A.2d 1183 ("[i]t is axiomatic that the state's burden of proof beyond a reasonable doubt applies to each and every element comprising the offense charged" [internal quotation marks omitted]), cert. denied, 266 Conn. 903, 832 A.2d 65 (2003). Although the same facts may have yielded sufficient evidence to support a conviction of another crime, the facts do not support a conviction of the crime of larceny by false pretenses, as defined by § 53a-119 (2).

Count eight of the amended information charged the defendant with larceny in the first degree by embezzlement in violation of §§ 53a-121 (b) and 53a-122 (a) (2).[10] The state alleged that the defendant had committed the crime of larceny by embezzlement when she wrongfully obtained $30,000 of Byxbee's assets. Specifically, the state alleged that the defendant issued two checks to herself and Seper from the proceeds of the sale of Byxbee's house on Dann Drive, which the defendant was holding in trust.

The defendant issued a series of checks from her Interest on Lawyers Trust Account[11] (attorney's account) disbursing the proceeds of the sale of Byxbee's house on Dann Drive to Hemingway, Cogswell and herself. Directing our attention to Hemingway's testimony that she did not pick up the checks made out to her and to members of her family until the day of Byxbee's memorial service, the defendant argues that because the checks were not issued until after Byxbee's death, Hemingway and Cogswell were, as the beneficiaries of Byxbee's estate, the owners of the embezzled property. The defendant further argues that the state failed to prove that Hemingway and Cogswell did not consent to the issuance of the two checks made out to the defendant and her husband. We disagree.

Section 53a-119 (1) provides that a person commits larceny by embezzlement when "with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . . (1) A person commits embezzlement when he wrongfully appropriates to himself or to another property of

---

[10] The defendant does not challenge the sufficiency of the evidence as to § 53a-121 (b) and the other elements of § 53a-122 (a) (2). See footnote 8. We therefore do not discuss them.

[11] Such an account is one in which attorneys deposit money belonging to their clients. The attorney is the trustee of the account.

another in his care or custody." Put another way, "[t]he crime of embezzlement is consummated where . . . the defendant, by virtue of his agency or other confidential relationship, has been entrusted with the property of another and wrongfully converts it to his own use. *State* v. *Lizzi*, 199 Conn. 462, 467, 508 A.2d 16 (1986)." (Internal quotation marks omitted.) *State* v. *Pezzuti*, 70 Conn. App. 840, 847, 800 A.2d 644, cert. denied, 261 Conn. 931, 806 A.2d 1069 (2002); see 29A C.J.S., Embezzlement § 29 (2007) ("[a]n act of embezzlement is complete the moment the fiduciary converts to his or her own use money belonging to the estate or trust").

Considering the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have made the following findings. The proceeds of the sale of Byxbee's house on Dann Drive were held by the defendant in trust in her attorney's account. The defendant issued a series of checks from this account, distributing the funds to Hemingway and Cogswell. The defendant also issued two checks, for $15,000 each, to herself and Seper, respectively. The checks were dated September 19, 2000, and signed by the defendant.

The jury heard testimony that at the time of the sale of her house, Byxbee was living at Mediplex and suffering from severe dementia. The defendant introduced into evidence a document, purportedly signed by Byxbee on September 19, 2000, authorizing the distribution of moneys from the sale of her house on Dann Drive. The jury then heard testimony from Cogswell that the signature on the document looked like Byxbee's but that she did not remember if it was one of the documents she took to Byxbee at Mediplex. The jury also heard evidence that Byxbee was unaware of the sale of the house in which she lived.

Contrary to the defendant's interpretation of the evidence, the jury reasonably could have inferred that the

defendant issued the checks on the day on which the checks were dated, September 19, 2000. General Statutes § 53a-118 (a) (11) provides in relevant part that "[a] person 'issues' a check when, as a drawer or representative drawer thereof, he delivers it or causes it to be delivered to a person who thereby acquires a right against the drawer with respect to such check. . . ." See General Statutes § 42a-3-105 (a) (defining "issue" as "the first delivery of an instrument by the maker or drawer, whether to a holder or nonholder, for the purpose of giving rights on the instrument to any person"). The jury also reasonably could have inferred that the defendant delivered to Seper the check written out to him on that same date. Thus, the jury reasonably could have concluded that the defendant and Seper wrongfully acquired a right to Byxbee's assets on September 19, 2000, prior to Byxbee's death on September 27, 2000. Moreover, the jury reasonably could have inferred that Byxbee did not authorize the distribution of the funds to the defendant and Seper. Thus, the jury reasonably could have concluded that the defendant, as trustee of the proceeds of the sale of Byxbee's home, wrongfully appropriated $30,000 to herself and Seper without Byxbee's consent.

"It is axiomatic that the state's burden of proof beyond a reasonable doubt applies to each and every element comprising the offense charged. But this burden of proof does not operate upon each of the many subsidiary, evidentiary, incidental or subordinate facts . . . upon which the prosecution may collectively rely to establish a particular element of the crime beyond a reasonable doubt. . . . Where the prosecution must rely upon circumstantial evidence, either in part or in whole, each link in the chain of circumstantial evidence need not be established beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Torres*, 111 Conn. App. 575, 586 n.5, 960 A.2d 573 (2008), cert.

denied, 290 Conn. 907, 964 A.2d 543 (2009). Accordingly, the evidence reasonably permitted a finding that the defendant embezzled the funds prior to Byxbee's death and without her consent.

D

The defendant also challenges the sufficiency of the evidence as to her conviction on counts ten and twelve alleging larceny in the first degree by embezzlement, as defined by § 53a-119 (1), in violation of § 53a-122 (a) (2).[12] In count ten, the state alleged that the defendant wrongfully appropriated $11,899.17 from the Byxbee trust by embezzlement. Similarly, in count twelve, the state alleged that the defendant wrongfully appropriated $20,000 from the Byxbee trust by embezzlement. The defendant argues that the state failed to prove that the defendant lacked consent to withdraw the funds from the Byxbee trust.

As explained in part C, the crime of embezzlement occurs when (1) the defendant is in lawful possession of the property of another and (2) wrongfully appropriates that property for her use with the intent to permanently deprive the rightful owner. See General Statutes § 53a-119 (1); 3 F. Wharton, supra, § 383, p. 463. "It is significant that the embezzlement results from the application of the defendant's wrongful conduct to the property of another that came into his possession lawfully but on which he now has acted wrongfully." *State* v. *Radzvilowicz*, 47 Conn. App. 1, 21, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997).

The jury heard evidence that in August, 1999, Byxbee purportedly had signed an "Authorization to Act As Counsel," which authorized the defendant to represent the Byxbee trust "[i]f, for any reason whatsoever,

---

[12] The defendant does not challenge the sufficiency of the evidence as to § 53a-122 (a) (2). See footnote 8. Therefore, we do not discuss it.

regardless of fault or blame, the insurance company does not send the proceeds to the [Byxbee trust] within [thirty] days after [Byxbee's] death" and provided that the defendant would receive a 25 percent contingency fee for recovery of the proceeds of the insurance policy. The jury heard evidence that Anna Lucia Hall, the woman whose name appeared as a witness to Byxbee's signature on the 1999 contract, had never met Byxbee or witnessed her signature.

The jury also heard evidence that subsequent to Byxbee's death, Hemingway and Cogswell signed a contract with the defendant, agreeing to the terms of the defendant's 1999 contract with Byxbee, including the provision that the defendant would receive 25 percent of the proceeds recovered from the insurance policy. In April, 2001, Mutual of Omaha sent payment to the defendant as trustee of the Byxbee trust for the life insurance policy proceeds and for refund of the policy premium. Thereafter, the defendant wrote a check for $20,000 from the Byxbee trust for the legal fees charged by the defendant and a check for $11,889.17 as a 25 percent contingency fee for recovery of the insurance policy premium. Hemingway and Cogswell signed a document authorizing the defendant to make disbursements from the Byxbee trust. The authorization included payment to the defendant of $11,889.17 as a contingency fee for recovery of the policy premium and payment of $20,000 for "[e]state [l]egal [f]ees and [t]rust fee retainer." Hemingway and Cogswell also signed a trust accounting, which authorized the disbursements to the defendant relating to her representation of the Byxbee trust.

Significantly, the jury heard evidence that in 1999 and 2000, Byxbee's health and mental well-being began to decline substantially. She became increasingly confused, would put garbage in the refrigerator and would forget to turn off the burner on the stove. Moreover, the

jury heard testimony that in 2000 Byxbee was diagnosed with severe, progressive dementia. Her physician testified that she had experienced cognitive impairment for at least the previous three to five years. The jury also heard testimony that Byxbee did not want to purchase the life insurance policy, and, to convince her to undergo a physical examination required by the insurance company, she was told that it had been ordered by her physician.

"Our task is to view the evidence in the light most favorable to sustaining the verdict before determining if the jury reasonably could have concluded that such evidence established guilt beyond a reasonable doubt. . . . We assume that the jury credited the evidence that supports the conviction if it could reasonably have done so." (Internal quotation marks omitted.) *State* v. *Thomas*, 110 Conn. App. 708, 726, 955 A.2d 1222, cert. denied, 289 Conn. 952, 961 A.2d 418 (2008). On the basis of the evidence presented at trial, the jury reasonably could have concluded that Byxbee did not have the mental capacity to enter into the 1999 contract with the defendant. Thus, the jury reasonably could have concluded that Hemingway's and Cogswell's subsequent ratification of the 1999 contract was void, and, as a result, the defendant wrongfully embezzled the funds.[13]

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient to support the jury's finding of guilty as to counts ten and twelve.

---

[13] We note that the jury's verdict of not guilty as to count eleven is not inconsistent with this reasoning. In count eleven, the state alleged that the defendant wrongfully obtained $102,093.15 as a 25 percent contingency fee for recovering the $400,000 life insurance policy. Specifically, the state alleged that the defendant committed this larceny by false pretenses, namely, that the sum was reasonable for the legal services rendered, rather than larceny by embezzlement.

## II

The defendant also claims that the court improperly directed the jury to find that the state had proven the element of materiality in count two, which charged the defendant with perjury. In her opening brief, the defendant concedes that she did not file a request to charge on the issue of materiality and did not object to the court's instruction.[14] Accordingly, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). The state, while agreeing that the instruction was improper, contends that the defendant either induced the impropriety or waived the claim. In response, the defendant argues that it was the state that caused the error. We conclude that the defendant has waived the claim.

Count two of the state's substitute information charged the defendant with the crime of perjury in violation of § 53a-156 (a), which provides in relevant part that "[a] person is guilty of perjury if, in any official proceeding, he intentionally, under oath, makes a false statement, swears, affirms or testifies falsely, to a material statement which he does not believe to be true." Specifically, the state alleged that during an official proceeding on or about December 10, 2002, the defendant knowingly testified falsely about the March 15, 2001 letter from Mutual of Omaha purporting to rescind the insurance policy on Byxbee's life.

The issue of materiality first arose during Rogan's testimony regarding a deposition he took of the defendant. The defendant's responses in the deposition formed the allegations in count one of the state's information.[15] At trial, defense counsel objected to Rogan's

---

[14] Our review of the record reveals that on March 6, 2006, the defendant submitted preliminary requests to charge, which included an instruction on materiality. In her reply brief, the defendant recognizes that she did in fact submit an instruction on materiality in her requests to charge.

[15] See footnote 1.

testifying as to whether the defendant's statements were material to the deposition. During argument to the court outside of the presence of the jury, defense counsel stated that "materiality is a legal issue which the judge can charge on and so forth. On the other hand, the issue is whether it's material to the process and not whether it was material to the lawyer and what he was doing. . . . It just seems to me that I don't think you can prove materiality by asking him why he was doing what he was doing." Later, the prosecutor responded: "In order to charge [the defendant with perjury], I have to show the jury how the statement was material. I can[not] get up and just argue it because that's not evidence." Defense counsel subsequently argued: "To have him define materiality, which is a legal issue, by saying what he was trying to prove . . . I just think if you let a lawyer, who has a financial interest in this thing, testify as to what he thought was material and what is material legally . . . it really gets us in serious problems." The court then asked for case law on the issue.

The next day, the prosecutor provided the court with *State* v. *Greenberg*, 92 Conn. 657, 103 A. 897 (1918).[16] When Rogan began to testify regarding his purpose in taking the defendant's deposition, defense counsel objected, arguing that *Greenberg* indicates that materiality is a legal issue for the court. The court overruled the objection. The prosecutor asked Rogan how his

[16] In *State* v. *Greenberg*, supra, 92 Conn. 657, our Supreme Court held that the question of materiality is a question of law and concluded that it was improper for the court to leave the determination of the materiality of the defendant's statement to the jury. Id., 661. Subsequently, our Supreme Court has recognized that a defendant is constitutionally entitled to have a jury instructed on each of the essential elements of the specific crime charged and to be acquitted unless he is proven guilty of each element beyond a reasonable doubt. *State* v. *Faust*, 237 Conn. 454, 469, 678 A.2d 910 (1996), citing *United States* v. *Gaudin*, 515 U.S. 506, 511, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995).

questions to the defendant during the deposition related to the object of the deposition. Defense counsel again objected, arguing that Rogan could not give an opinion as to materiality because it is a legal issue for the court. The state responded that the object of the deposition related to materiality, which is an issue for the jury to decide. The court sustained the objection and instructed the prosecutor to rephrase the question.

On March 6, 2006, the defendant submitted preliminary requests to charge. The requests to charge included an instruction that with regard to the crime of perjury, the state must prove beyond a reasonable doubt that the defendant's statement was material to the proceedings in that it was capable of influencing or had the potential to influence the fact finder in deciding the issues. During the charging conference on March 8, 2006, the state requested the court to instruct the jury that the defendant's statements were material to the proceedings as a matter of law and that the element of materiality is not an element for its consideration. Defense counsel objected, stating that "if in fact there are sufficient facts before the court, I would agree with *Greenberg*, it's strictly a matter of law. I just don't think the record here is sufficient for the court to make that determination as a matter of law." On March 9, 2008, the following colloquy between the court and defense counsel took place:

"[Defense Counsel]: . . . I'd like to know whether the court is going to charge the jury as a matter of law that—on count two, that the alleged perjury was material to that—

"The Court: The answer to that is yes.

"[Defense Counsel]: Okay. Thank you.

"The Court: I will tell them that pursuant to the definition of materiality, that the [defendant's] testimony was

indeed material and that it was capable of influencing the issue before the court at the time." Defense counsel did not object. The court then instructed the jury that as a matter of law, the defendant's testimony was material.[17]

"Waiver is an intentional relinquishment or abandonment of a known right or privilege. . . . It involves the idea of assent, and assent is an act of understanding. . . . The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim." (Internal quotation marks omitted.) *State* v. *McDaniel,* 104 Conn. App. 627, 633, 934 A.2d 847 (2007), cert. denied, 285 Conn. 912, 943 A.2d 471 (2008).

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment [to the United States constitution] protects an

---

[17] Specifically, in its charge to the jury, the court instructed the jury that the state must prove six elements to meet its burden of establishing that the defendant committed perjury. The court further instructed the jury that one of the elements is that the statement made by the defendant was material. The court then stated: "The test of materiality is whether the false statement testimony was capable of influencing or had the potential to influence the fact finder in deciding the issues. . . . [A]s a matter of law I will tell you that it was material, so at least you don't have to concern yourself when you get to that element; it's a matter of law, the testimony was material, and . . . it was capable of influencing or had the potential to influence the fact finder." In reviewing the elements, the court again instructed the jury that "whether or not the testimony was material, [that is] not for your consideration. That you will find as a matter of law."

accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . *State* v. *Gabriel*, 192 Conn. 405, 413–14, 473 A.2d 300 (1984) [citing *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)]. Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are. . . . *State* v. *Denby*, [235 Conn. 477, 483–84, 668 A.2d 682 (1995)]." (Internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 124–25, 951 A.2d 531 (2008). It is well established, however, that a criminal defendant may waive one or more of her fundamental rights. *State* v. *Cooper*, 38 Conn. App. 661, 669, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996). More specifically, "waiver of the right to require the state to prove each element of a crime may be made by counsel and may be inferred from the absence of an objection." Id., 670. Thus, a defendant may explicitly or implicitly waive the right to have the jury instructed on each element of the crime charged. See *State* v. *Duncan*, 96 Conn. App. 533, 560, 901 A.2d 687 (claim of improper jury instruction waived when defendant expressed satisfaction with instruction and failed to object), cert. denied, 280 Conn. 912, 908 A.2d 540 (2006).

Here, the defendant not only failed to object to the instruction on the ground on which she now appeals but also expressed her agreement with the proposition that materiality is a question of law for the court and should not be submitted to the jury. When the state requested that the court instruct the jury that the defendant's testimony was material as a matter of law and that the element of materiality is not for its consideration, the defendant objected only on the ground that

the facts were insufficient for the court to make a determination as to materiality. Defense counsel stated that *"if in fact there are sufficient facts before the court,* I *would agree with Greenberg, it's strictly a matter of law.* I just don't think the record here is sufficient for the court to make that determination as a matter of law." (Emphasis added.) Moreover, when defense counsel inquired the next day as to whether the court would give the proposed materiality instruction, and the court responded in the affirmative, defense counsel stated: "Okay. Thank you." He did not object to the instruction.

Although, as the defendant argues, the state requested that the court instruct the jury that the element of materiality was not for its consideration, this fact does not diminish defense counsel's assent to the improper instruction.[18] We note that in her requests to charge, the defendant submitted an instruction in which the jury was charged that it must determine materiality. In subsequent discussions with the court, however, defense counsel indicated a belief that materiality was an issue of law for the court to determine. By stating that *Greenberg* required the court to determine materiality as a matter of law and by later agreeing to the court's instruction that the defendant's testimony at the deposition was material to the issue before the court, the defendant explicitly reversed her position as to the proper instruction. It would be inconsistent with the principles behind our jurisprudence regarding waiver to allow a defendant to put forth one argument in her requests to charge, subsequently to make a contrary argument before the court and then, when the court has adopted the defendant's second position, to claim error on appeal. Accordingly, we conclude that the defendant has waived any challenge to the court's instruction on materiality. See, e.g., *State* v. *Whitford,*

---

[18] Neither the state nor the defendant was consistent in their positions as to whether materiality is a question of law or fact.

260 Conn. 610, 633, 799 A.2d 1034 (2002) (defendant waived right to challenge jury instruction when defendant objected to original instruction, later agreed to amended instruction and failed to object to charge given); *Stuart* v. *Stuttig*, 63 Conn. App. 222, 227, 772 A.2d 778 (2001) (defendant waived right to challenge instruction when defendant filed request to charge on issue of apportionment but later abandoned request).

The defendant also requests review under *Golding*. Because we conclude that the defendant waived her claim, we decline to afford *Golding* review. See *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 73, 967 A.2d 41 (2009) (noting that unpreserved, waived claims fail under third prong of *Golding* and declining to afford review under *Golding* to petitioner who waived claim); see also *State* v. *Velez*, 113 Conn. App. 347, 359, 966 A.2d 743 (defendant's waived claim of improper jury instruction fails under third prong of *Golding*), cert. denied, 291 Conn. 917, 970 A.2d 729 (2009); *State* v. *Duncan*, supra, 96 Conn. App. 560 (same).

The judgment is reversed only with respect to the conviction on count six, larceny in the second degree, and count seven, larceny in the first degree, and the case is remanded with direction to render judgment of not guilty of those crimes. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.