STATE OF CONNECTICUT *v.* PRISCILLA C. DICKMAN
(AC 33781)

Alvord, Sheldon and Harper, Js.

Argued April 22—officially released September 24, 2013

*Daniel M. Erwin,* with whom was *Norman A. Pattis,* for the appellant (defendant).

*Rocco A. Chiarenza,* assistant state's attorney, with whom, on the brief, were *Kevin T. Kane,* chief state's attorney, and *Marcia A. Pillsbury,* deputy assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Priscilla C. Dickman, appeals from the judgment of conviction, rendered after a jury trial, of four counts of forgery in the second degree in violation of General Statutes § 53a-139.[1] On appeal, the defendant claims: (1) there was insufficient evidence upon which to convict her of forgery in the second degree under § 53a-139 (a) (1); (2) the court improperly admitted documents under the business records exception to the hearsay rule; and (3) the state violated the defendant's due process rights under the state and federal constitutions by failing to disclose exculpatory evidence. We affirm the judgment of the trial court.

This case arises from an underlying investigation into the authentication of documents allegedly submitted by the defendant to the benefits unit of the human

---

[1] General Statutes § 53a-139 (a) provides: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; or (2) a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant; or (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality; or (4) a prescription of a duly licensed physician or other person authorized to issue the same for any drug or any instrument or device used in the taking or administering of drugs for which a prescription is required by law."

resources office of her employer, the University of Connecticut Health Center (health center). The jury reasonably could have found the following facts. The defendant was the chief steward for one of the unions at the health center. She suffered from a disability and, consequently, received workers' compensation benefits and was subject to workplace restrictions including a four day work week. In April, 2005, Margaret Swets, a human resource associate at the health center, approached Karen Duffy Wallace, the director of labor relations at the health center, to raise a concern about the authentication of a doctor's note in the defendant's medical file. The note was purportedly authored and signed by Micha Abeles, a physician at the health center, indicating that the defendant would be unable to work on March 4, 2005. The note looked like it had been altered, so Wallace asked Swets to gather the defendant's entire medical file to compare the various documents therein.

Wallace discovered another doctor's note that was virtually identical to the first note, indicating that the defendant would be unable to work on October 4, 2004. A comparison of the two notes revealed what appeared to be a label placed over the date of October 4, 2004, on the former note and the date of March 4, 2005, substituted in its place on the latter note. In addition, in the place on the latter note that indicated the date of injury, the date of January 16, 2005, was added above the original date of injury of October 19, 1979, which appears alone on the former note. In all other respects, such as writing style and wording, the two notes were virtually identical.

After discovering the discrepancies between the two doctor's notes, Wallace asked Swets to take a closer look at the defendant's medical file to see if there was anything else that had some questionable aspect to it.

Wallace was provided with two other documents purportedly signed by Abeles and two documents purportedly signed by Paul Tortland, a physician practicing in Avon and Glastonbury. The two documents purportedly signed by Abeles were a state family medical leave or employee fitness for duty certification form (fitness for duty form) and a medical certificate. The two documents purportedly signed by Tortland were worker status reports. The two worker status reports were both dated February 1, 2005, with identical writing style and wording as to the provider's name, provider's location, provider's signature, date, and license number, but with different content.

Wallace then asked Jessica Van Alstyne, the benefits supervisor at the health center, to contact the two physicians to verify the authenticity of the respective documents. Van Alstyne sent separate facsimiles of the respective documents to Abeles and Tortland, and asked them to confirm whether they had authored and signed them. Abeles, via e-mail, confirmed that the three documents in question had been approved by him. Tortland was contacted by Officer Gary Loomis of the health center's police department and, with respect to the worker status reports, Tortland indicated that the signatures on both documents appeared to be identical, leading him to suspect that there had been a "cut and paste."

After Van Alstyne reported to Wallace, Wallace contacted the department of public safety at the health center and spoke with the Chief of Police Neil Sullivan. They decided to interview Abeles on May 9, 2005. Wallace then decided to interview the defendant on May 19, 2005, together with Swets and Van Alstyne. Wallace presented the defendant with the four forms from Abeles and asked her questions. The defendant indicated that the first note was a draft and was intended to be sent to Abeles, but that she accidentally sent this note via facsimile to Swets. The defendant was very

detailed and cooperative at this point, but when Wallace presented the defendant with the two forms from Tortland, the defendant seemed shocked and surprised, answered a couple of questions, and then ended the interview. Later that day, the defendant indicated to Wallace that she had to fill out many forms from Tortland herself because the office staff would not fill out the forms for her.

Subsequent thereto, the defendant was arrested on March 29, 2007. The defendant was charged by substitute amended long form information with four counts of forgery in the second degree in violation of § 53a-139 (a) (1). Counts one through four concerned, respectively, one of the worker status reports, the doctor's note indicating that the defendant would be unable to work on March 4, 2005, the fitness for duty form, and the medical certificate. The defendant pleaded not guilty to all the charges. A jury trial followed on March 21, 2011, and continued until March 24, 2011.

At trial, the four Abeles documents and the two Tortland documents were submitted into evidence along with a certificate for return to work purportedly signed by Tortland. Abeles testified that the doctor's note authorizing the defendant to miss work on October 4, 2004, had been authored and signed by him, but the doctor's note authorizing the defendant to miss work on March 4, 2005, had not been authored or signed by him but, rather, was submitted without his authorization after the dates were altered from the previous doctor's note. He also testified that he did not fill out the fitness for duty form and that the signature on the bottom of the form was not his. He further testified that he never saw the medical certificate, which was not authored or signed by him. When asked about the e-mail he previously had sent to Swets indicating that the three documents in question had been approved by

him, Abeles suggested that he had been trying to protect the defendant.

Tortland testified that there was nothing misleading about either worker status report, and that, where possible, he would have patients or his medical assistant fill out as much of the form as possible to relieve him from tedious clerical work. When asked about his previous statement to Loomis indicating that the signatures on both documents appeared to be identical, leading him to suspect that there had been a "cut and paste," Tortland testified that he had felt intimidated at that meeting and did not have the opportunity to reflect on the full context in which those documents had been completed.

At the close of the state's case, the defendant filed motions for a judgment of acquittal pursuant to Practice Book §§ 42-41 and 42-42, which were denied by the trial court. The jury found the defendant guilty on all of the charges. Thereafter, the trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective prison term of four years, execution suspended, with five years of probation. This appeal followed.

I

The defendant first claims that there was insufficient evidence upon which to convict her of forgery in the second degree under § 53a-139 (a) (1).[2] We disagree.

[2] In conjunction therewith, the defendant also claims that the court improperly denied her oral motions for a judgment of acquittal, which were argued at the close of the state's case-in-chief. We note, however, that there is no distinction between these two putative claims because the defendant did not present a case after the state's case-in-chief and, even still, "[i]t is the propriety of the jury's verdict of guilty, not the propriety of the court's denial of a motion for a judgment of acquittal after the state's case-in-chief has been concluded, that we review." (Internal quotation marks omitted.) *State* v. *Legrand*, 129 Conn. App. 239, 267 n.22, 20 A.3d 52, cert. denied, 302 Conn. 912, 27 A.3d 371 (2011).

"In reviewing a sufficiency of the evidence claim, we apply a [two part test]. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine, whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal

quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000).

The defendant argues that the state failed to offer any evidence or to prove that the documents in question were legal documents affecting a legal right, interest, obligation, or status necessary for a conviction under § 53a-139 (a) (1). The defendant contends that none of the documents in question are specifically enumerated under subdivision (1) and, furthermore, they do not fall within the catchall, "other instrument" provision of the statute because, pursuant to the doctrine of ejusdem generis, the "medical" documents in question are not of the same general kind or character as those specifically enumerated, which concern documents altering legal relationships affecting property rights for which a person would rely on the assistance of an attorney, not a physician, and entitle a party to immediate civil judicial review. The defendant further contends that subdivision (4) is the sole subdivision under § 53a-139 that relates to physicians and is limited to prescription documents. In the alternative, the defendant invokes the rule of lenity and argues that the statutes for forgery in the second degree and forgery in the third degree are indistinguishable from one another and, therefore, that they are unconstitutionally vague as applied to her. We are not persuaded.

The defendant's claim requires a consideration of the relevant statutory scheme. "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text

of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . Issues of statutory construction involve questions of law over which we exercise plenary review." (Citation omitted; internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, 297 Conn. 66, 74–75, 3 A.3d 783 (2010).

"The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by [the United States Supreme] Court. . . . The constitutional requirement of definitiveness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed. . . .

"There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . . Second . . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. . . . Third, [t]here can be no doubt that deprivation of the right of fair warning

can result . . . also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. . . . In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal. . . .

"[With respect to these doctrines], the unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement . . . . In other words, [d]ue process does not require statutes to provide a laundry list of prohibited conduct. . . . The constitution requires no more than a reasonable degree of certainty. . . . Moreover, [d]ue process is not . . . violated simply because the issue is a matter of first impression." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 721–25, 998 A.2d 1 (2010). "[W]hile . . . criminal statutes are to be construed strictly, the language in a criminal statute need not be given its narrowest possible construction. . . . [R]eferences to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . . We [also] can use as a guide judicial opinions that, [although] not binding on this court, refer to the statute in question or to a statute that uses similar language." (Internal quotation marks omitted.) Id., 725–26.

We also recognize "that the fundamental purpose of the void for vagueness doctrine is to ensure fair warning in order to avoid traps *for the innocent*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 770, 988 A.2d 188 (2010). The rule of lenity, on the other hand, "concerns situations in which a legislature fails to give notice of the scope of punishment by leaving a grievous ambiguity or uncertainty in the language and structure of the [statute],

such that even after a court has seized everything from which aid can be derived, it is still left with an ambiguous statute . . . in which case the rule of lenity tips the scales in favor of the defendant by requiring the court to impose the lesser of two penalties." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, supra, 296 Conn. 722 n.71.

We begin with the relevant statutory language. Section 53a-139 (a) provides in relevant part: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status . . . ." We recognize that none of the documents in question constitutes a deed, will, codicil, contract, assignment or commercial instrument and, thus, they must fall within the general category of "other instrument[s]" in order to constitute forgery in the second degree under § 53a-139 (a) (1). We also are mindful that "[u]nder the doctrine of ejusdem generis, when a statute . . . sets forth a specific enumeration of things, general terms will be construed to embrace things of the same general kind or character as those specifically enumerated." (Internal quotation marks omitted.) *Heim* v. *Zoning Board of Appeals*, 289 Conn. 709, 717 n.9, 960 A.2d 1018 (2008). Thus, "other instrument[s]" must be construed to be of the same general kind or character as deeds, wills, codicils, contracts, assignments and commercial instruments.

The defendant attempts to distinguish between the enumerated documents and the documents in question in this case by arguing that the enumerated documents,

as opposed to the documents in question, alter legal relationships affecting property rights for which a person would rely on the assistance of an attorney and entitle a party to immediate civil judicial review. We are aware of no authority construing § 53a-139 (a) (1) in this fashion. In any event, the defendant's position is untenable because § 53a-139 (a) (1) defines the "general kind or character" of the "other instrument[s]" as those "which [do] or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status . . . ." Indeed, it would be illogical for there to be an instrument that fits within this definition but somehow does not fall under § 53a-139 (a) (1) merely because it is not similar *enough* to a deed, will, codicil, contract, assignment or commercial instrument for some other arbitrary reason.

We recognize that § 53a-139 (a) (4),[3] which concerns prescription documents, is the only subdivision that specifically applies to documents authored and/or signed by physicians. The defendant appears to argue that the existence of this subdivision is an indication that documents authored and/or signed by physicians are not within the ambit of § 53a-139 (a) (1) because prescription documents affect a legal right to prescription drugs or devices and, based on our construction of § 53a-139 (a) (1), § 53a-139 (a) (4) would be wholly unnecessary. We do not read subdivisions (1) through (4) as mutually exclusive. In fact, any number of documents may fall under any number of subdivisions. Indeed, a deed is expressly listed under subdivision (1) but also may constitute a public record under subdivision (2).[4] See e.g., General Statutes §§ 7-23 and 47-10.

[3] Forgery in the second degree includes "a prescription of a duly licensed physician or other person authorized to issue the same for any drug or any instrument or device used in the taking or administering of drugs for which a prescription is required by law." General Statutes § 53a-139 (a) (4).

[4] Forgery in the second degree includes "a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant . . . ." General Statutes § 53a-139 (a) (2).

Assuming without deciding that a prescription document under subdivision (4) falls under subdivision (1) as well, we view the existence of subdivision (4) as an indication of the legislative intent to ensure that forgery of prescription documents constitutes forgery in the second degree under § 53a-139 (a). Furthermore, any uncertainty respecting the nature of any document under § 53a-139 (a) (1) arises from the fact that there is no absolute and finite list of instruments "which [do] or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status . . . ."

For example, our courts have rendered convictions under § 53a-139 (a) (1) for various "other instrument[s]" not expressly listed thereunder. See *State* v. *Akande*, 299 Conn. 551, 552–55, 11 A.3d 140 (2011) (conviction under § 53a-139 [a] [1] and [2] for forged insurance cards presented to Department of Motor Vehicles); *State* v. *Paige*, 115 Conn. App. 717, 729–35, 974 A.2d 782 (2009) (conviction under § 53a-139 [a] [1] for forged letter submitted in civil proceeding), rev'd in part on other grounds, 304 Conn. 426, 40 A.3d 279 (2012); *State* v. *Servello*, 80 Conn. App. 313, 314–18, 835 A.2d 102 (2003) (conviction under § 53a-139 [a] [1] for forged letter submitted in habeas corpus proceeding), cert. denied, 267 Conn. 914, 841 A.2d 220 (2004). Ultimately, we cannot conclude that documents authored and/or signed by physicians are excluded from the ambit of § 53a-139 (a) (1).

The defendant still invokes the vagueness doctrine and the rule of lenity for the proposition that the language of § 53a-139 (a) (1) is unconstitutionally vague as applied to her especially in light of the language of forgery in the third degree. General Statutes § 53a-140 (a) provides: "A person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written

instrument or issues or possesses any written instrument which he knows to be forged." We recognize that "because the elements of forgery in the third degree must be proven before the defendant can be convicted of forgery in the second degree, it is a lesser included crime of forgery in the second degree." *State* v. *Cooke*, 42 Conn. App. 790, 802, 682 A.2d 513 (1996).

The defendant is correct to note that the fundamental difference between forgery in the second degree and forgery in the third degree is the nature of the instrument. Both forgery in the second degree and forgery in the third degree require a written instrument. A written instrument is "any instrument or article containing written or printed matter or the equivalent thereof, used for the purpose of reciting, embodying, conveying or recording information or constituting a symbol or evidence of value, right, privilege or identification, which is capable of being used to the advantage or disadvantage of some person." General Statutes § 53a-137 (1). The difference is that forgery in the second degree under § 53a-139 (a) (1) requires a written instrument "which does or may evidence, create, transfer, terminate or *otherwise affect a legal* right, interest, obligation or status . . . ." (Emphasis added.)

This court previously has highlighted the difference between forgery in the second degree and forgery in the third degree. See *State* v. *Yurch*, 37 Conn. App. 72, 78–79, 654 A.2d 1246, appeal dismissed, 235 Conn. 469, 667 A.2d 797 (1995). In *Yurch*, the defendant argued that his conviction for forgery in the third degree was improper because the state failed to prove that he falsely made a contract for the purchase of a lot that, if completed, would create and transfer a *legal* right to property. Id., 78. This court concluded that the state was required to prove only that the defendant falsely

made a written instrument, not a contract that if completed would create and transfer a *legal* right to property. Id., 79. Ultimately, it is the "legal" nature and effect of the document that separates forgery in the second degree under § 53a-139 (a) (1) from forgery in the third degree under § 53a-140.

Furthermore, we find nothing ambiguous about this language.[5] In order to *affect* a legal right or interest, a document must "produce an effect on" or "influence in some way" such legal right or interest. Black's Law Dictionary (9th Ed. 2009). A *legal right*, specifically, is "[a] right created or recognized by law." Id. A *legal interest*, specifically, is "[a]n interest that has its origin in the principles, standards, and rules developed by courts of law" or "an interest recognized by law." Id. The defendant still maintains that the breadth of this language will subsume forgery in the third degree. We do not find this argument persuasive. For example, persuasive authority from our sister state of New York has provided a cogent example of the line between second and third degree forgery. See *People* v. *Gause*, 2 App. Div. 3d 1449, 770 N.Y.S.2d 531 (2003). In *Gause*, the court concluded, under forgery statutes with a similar construction as Connecticut's, that forgery of shipping labels addressing items to the defendant's house only constituted forgery in the third degree because the forgery merely directed delivery of the items without affecting the legal right thereto. See id., 1450.

Generally speaking, under § 53a-139 (a) (1), the state posits that the documents in question "otherwise affect

---

[5] Even if we were to determine that any ambiguity exists, such ambiguity would only touch upon whether the defendant may be convicted of forgery in the second or third degree. See *State* v. *Winot*, supra, 294 Conn. 759–61; id., 770 ("the fundamental purpose of the void for vagueness doctrine is to ensure fair warning in order to avoid traps *for the innocent*" [emphasis in original; internal quotation marks omitted]). Thus, the void for vagueness doctrine is wholly inapplicable.

a legal right [or] interest" to workers' compensation benefits. See General Statutes § 31-275 et seq. The parties stipulated that "employees of the state of Connecticut, such as [the defendant], who get injured on the job or who are too sick to work, are protected from economic hardship by the state of Connecticut Workers' Compensation Act, various state and/or federal statutes, and/or any applicable collective bargaining unit agreements. There is no question that the defendant . . . was qualified for benefits under these laws." With this contention in mind, we turn to the documents.

Count one of the substitute amended long form information concerns one of the worker status reports. This worker status report bears the defendant's name and indicates limitations upon her return to work on February 7, 2005. The document also bears Tortland's putative signature. Tortland testified that this is a document provided to him by the workers' compensation carrier, GAB Robbins North America, Inc., on which he documents any limitations upon his patient's return to work. Wallace testified that worker status reports are used to document absences and returns to work for workers' compensation. Swets testified that when an employee suffers a work-related injury and chooses to treat for that injury, a worker status report must be completed by the treating physician and filed by the employee. Swets further testified that there were initial concerns with the first worker status report after the second, allegedly forged, worker status report was filed with fewer limitations.

Count two of the substitute amended long form information concerns the doctor's note bearing the defendant's name and indicating that she would be unable to work on March 4, 2005. The document also indicates dates of injury of January 10, 2005, and October 19, 1979. The document also bears Abeles' putative signature. Wallace testified that the doctor's note was submitted

to justify the defendant's absence from work. Wallace further testified that all the documents are "official forms, either state forms or health center forms that need to be filled out for any leave." Wallace also testified that she believed that the doctor's note was also submitted for workers' compensation purposes used to track throughout the process of the workers' compensation claim which documents related to which claim of injury.

Count three of the substitute amended long form information concerns the fitness for duty form. The fitness for duty form bears the defendant's name and indicates that her leave commenced on March 10, 2005, and that she would be able to resume working on March 28, 2005. The fitness for duty form also references General Statutes § 5-248a[6] and indicates that, "[a]s a condition of restoration, [the defendant] must provide a written certification from [her] health care provider certifying that [she is] able to resume working." The fitness for duty form bears Abeles' putative signature. Wallace testified that the purpose of this form is for a physician to certify when an employee can come back to work following a family medical leave of absence.

Count four of the substituted amended long form information concerns the medical certificate. The medical certificate bears the defendant's name and indicates: "No sick leave, federal FMLA, state family/medical leave ([General Statutes §] 5-248a), special leave with pay in excess of five (5) days, or leave as otherwise prescribed by contract, shall be granted state employees unless supported by a medical certificate filed with, and acceptable to, the appointing authority. The period of

---

[6] General Statutes § 5-248a (c) provides in relevant part: "Any permanent employee who requests a medical leave of absence due to the employee's serious illness . . . shall be required by the employee's appointing authority, prior to the inception of such leave, to provide sufficient written certification from the physician of such employee . . . as appropriate, of the nature of such illness and its probable duration. . . ."

incapacity . . . must be reported with a description of the nature of the incapacity entered . . . ." The document bears Abeles' putative signature. Wallace testified that this document must be filled out by a physician and is used by all state agencies when an employee is going to be out of work.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that each of the documents affected a legal right or interest sufficient to constitute forgery in the second degree under § 53a-139 (a) (1). The parties stipulated that "employees of the state of Connecticut, such as [the defendant], who get injured on the job or who are too sick to work, are protected from economic hardship by the state of Connecticut Workers' Compensation Act, various state and/or federal statutes, and/or any applicable collective bargaining unit agreements. There is no question that the defendant . . . was qualified for benefits under these laws." The jury reasonably could have inferred that the documents were part and parcel of a broader scheme concerning benefits related to leaves of absence and returns to work.

The evidence at trial reveals the following. The medical certificate indicates that *no* sick leave, whether under federal law, state law or contractual law, shall be granted *unless* the medical certificate is filed with the appointing authority. The fitness for duty form *requires* the defendant to acknowledge that, as a condition of restoration, she *must* provide a written certification from her health care provider that she is able to resume working. The worker status reports are provided by the workers' compensation carrier to the physician, and must be filed by the employee before returning to work. Furthermore, the doctor's note was submitted to justify the defendant's absence from work on March

4, 2005. The documents were not used merely to document absences and returns to work, but to authorize them. We conclude that there was sufficient evidence upon which to convict the defendant of four counts of forgery in the second degree under § 53a-139 (a) (1).

## II

The defendant next claims that the court improperly admitted documents under the business records exception to the hearsay rule. We disagree.

"To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . .

"We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought. . . . [A]ppellate courts will defer to the trial court's determinations on issues dictated by the exercise of discretion, fact finding, or credibility assessments." (Citations omitted; internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

The defendant argues that, with respect to the doctor's notes, the fitness for duty form, the medical certificate, the certificate for return to work and the worker status reports, the foundational testimony preceding admission of the disputed documents was inadequate to satisfy any condition of the business records exception, in that some conditions were wholly ignored. On this basis, the defendant contends that the documents should have been excluded from evidence. Further, she argues that there was no evidence of forgery other than this disputed evidence and that there is no alternative theory to uphold the verdict. We are not persuaded.

During the trial, the state sought to admit the doctor's notes, the fitness for duty form, the medical certificate, the certificate for return to work and the worker status reports. The state first sought to admit the doctor's note, indicating that the defendant was unable to work on March 4, 2005. Wallace testified that the doctor's note was kept in the regular course of business in the benefits unit of the human resources office at the health center to provide documentation of the defendant's absence from work. The defendant objected, arguing that the doctor's note constituted hearsay, and thus an adequate foundation had not been laid under the business records exception or under any other exception to the hearsay rule. The court overruled the objection, stating: "I think I have heard enough to conclude and indicate that this did come from the records of the hospital, and I think it's sufficiently reliable on that basis to allow—it does not—or it is not just detritus that has come into the file; that it is maintained by the hospital on behalf of the staff and the records of the staff." The other documents were subsequently admitted over the defendant's standing objection on the same grounds.

"An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible

unless they fall within a recognized exception to the hearsay rule. . . . A statement made out of court is not hearsay [however] unless it is offered to establish the truth of the facts contained in the statement." (Citations omitted; internal quotation marks omitted.) *State v. Perkins*, 271 Conn. 218, 254, 856 A.2d 917 (2004).

In the present case, the documents in question either constitute the instrumentalities of the crime of forgery in the second degree or were used for comparative purposes. None of the documents were used to prove the truth of the matter asserted therein. For example, the doctor's notes were not submitted to prove that the defendant was unable to work on October 4, 2004, and March 4, 2005. The fitness for duty form was not submitted to prove that the defendant could return to work on March 28, 2005. The medical certificate was not submitted to prove that the defendant had a medical condition qualifying her for medical leave. The certificate for return to work and the worker status reports were not submitted to prove that the defendant was able to return to work on February 7, 2005, with certain limitations. Thus, we conclude that because the documents do not constitute hearsay, the business records exception to the hearsay rule is wholly inapplicable to their admissibility.

## III

The defendant finally claims that the state violated her due process rights under the state and federal constitutions by failing to disclose exculpatory information. We disagree.

Before trial, the defendant filed a request for disclosure of exculpatory material. At the beginning of trial, defense counsel moved, inter alia, for a mistrial on the ground that the state had failed to disclose exculpatory evidence from Tortland, which evidence defense counsel claimed to have been discovered on the eve of the

trial. After a brief proffer as to the nature of the evidence by defense counsel, the court denied the motion without prejudice. In doing so, the court noted: "Certainly, if the defense needs time to contact a witness that was unexpected or so forth, we will discuss that. The defense will be given every opportunity to present their theory of the case in the way that they want to present it, within reason, of course."

After Tortland began his testimony, defense counsel sought a proffer from Tortland outside of the jury's presence related to such putative exculpatory evidence and the court granted the request. Tortland testified that he was interviewed in January, 2011, by representatives from the Office of the Chief State's Attorney, Attorney John R. Whalen and Inspector John Torrento, about an affidavit that he had signed in 2005 relating to certain documents from his office. Tortland testified about what he stated to Whalen and Torrento in this interview, which included the following. He had been visited by Loomis in 2005 about these documents and had agreed at that time that there appeared to be some alterations in them. The encounter with Loomis was intimidating, and, upon later reflection, he did not find the documents inappropriately altered and he would have signed off on them.

Defense counsel moved for a mistrial and for dismissal of the charges on the ground that the state had failed to disclose this exculpatory evidence related to the interview in January, 2011. In the alternative, defense counsel moved to dismiss the charges related to the worker status reports bearing Tortland's signature or that Tortland not be permitted to testify. There was no testimony or evidence offered about when the defense was made aware of the evidence, but there were conflicting representations. The court denied the defendant's motion in its entirety, finding "at least a question of some fact pertaining to the disclosure of

this material [and] . . . lack of clarity as to when the responsibility shifted from the state's obligation to affirmatively and clearly disclose to the defense to follow up on any information it may have received. Setting that aside, [the court] find[s] that no prejudice accrues to the defense if this information came to them late. . . . The ultimate effect may be upon the jury itself, that's yet to be seen."

Thereafter, on cross-examination before the jury, defense counsel elicited from Tortland that there were minimal clinically significant differences between the worker status reports, which were both consistent with his observations of the defendant. He further testified that there was nothing misleading about either document, and that, when possible, he would have patients or his medical assistant fill out as much of the form as possible to relieve him from tedious clerical work. Defense counsel further elicited from Tortland: "[A]t the time that I had been presented with the document, in 2005, I didn't have the full context within which those documents had taken place. When, later on, I had the opportunity to reflect on the full context in which those documents transpired between my office and the health center, I saw no inconsistencies between the two documents or the circumstances in which they took place."

The defendant argues that the state failed to disclose the exculpatory evidence of Tortland's interview with Whalen and Torrento in which Tortland stated that he did not find the documents inappropriately altered and that he would have signed off on them. In particular, the defendant argues that she was relieved from the obligation to prove prejudice because her counsel discovered the evidence, which makes it more akin to nondisclosed exculpatory evidence, and the obligation to prove prejudice only applies to *late disclosed* exculpatory evidence. In this regard, the defendant contends that the exculpatory evidence meets the test set forth

in *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The defendant argues, in any event, that she has been prejudiced by the late disclosure, which hindered her ability to prepare a defense. We are not persuaded.

We begin our analysis by setting forth the standard of review. "Although the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances [that] may arise during the trial in which his function is to [ensure] a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court. . . .

"The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. [Id.] . . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the suppressed evidence was favorable to the defense; and (3) that the evidence was material. . . .

"[E]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*. . . . Even if evidence is not deemed suppressed under *Brady* because it is disclosed during trial, however, the defendant nevertheless may be prejudiced if he is unable to use the evidence because of the late disclosure. . . . Under these circumstances, the defendant bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time." (Citations omitted; internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 270–72, 49 A.3d 705 (2012).

In the present case, there is no dispute that the defendant had the putative exculpatory evidence before trial. The defendant attempts, however, to draw a distinction between late disclosure of evidence and evidence discovered on the part of the defense alone in order to avert the prejudice requirement. We see no functional difference between these two scenarios because both pieces of evidence would be available at trial. Instead, the functional difference lies between evidence available at trial and evidence not available at trial. This conclusion is supported most notably by the fact that suppressed evidence also must be material. "The test for materiality is well established. The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . The court explained that a showing of materiality does

not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 453–54, 758 A.2d 824 (2000).

As a practical matter, it does not make sense to consider the materiality of evidence if it was available at trial unless the evidence was disclosed or discovered late, causing prejudice to the defendant, because materiality is considered in the *absence* at trial of such evidence in order to determine whether the defendant received a fair trial. See id., 454. If there is no prejudice from the late disclosure or discovery of such evidence, then the verdict itself reveals the materiality of evidence that was available at trial.

In the present case, the defendant has shown no prejudice as to the late disclosure or discovery of the evidence.[7] The defendant had the opportunity to cross-examine Tortland about the interview in January, 2011, and elicited from him the following: "[A]t the time that I had been presented with the document, in 2005, I didn't have the full context within which those documents had taken place. When, later on, I had the opportunity to reflect on the full context in which those documents transpired between my office and the health center, I saw. no inconsistencies between the two documents or the circumstances in which they took place." The defendant has not shown that she would have done

---

[7] The record is devoid of any finding of fact as to if and when the evidence was disclosed to the defendant, but the record is clear that the evidence was disclosed or discovered before trial.

anything different with this evidence if it was disclosed or discovered sooner, or that she could not properly use this evidence because it was disclosed or discovered on the eve of trial. Furthermore, to the extent that any time was needed, the court indicated that "[t]he defense will be given every opportunity to present their theory of the case in the way that they want to present it, within reason, of course." There is nothing in the record to suggest that the defendant requested more time or that any time was necessary given the nature of the evidence. There was no prejudice.

The judgment is affirmed.

In this opinion the other judges concurred.

